**IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE**

| | | |
|---|---|---|
| THE DOW CHEMICAL COMPANY, | ) | |
| ROHM AND HAAS COMPANY, | ) | |
| ROHM AND HAAS CHEMICAS LLC | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | C.A. No. 12090-VCG |
| | ) | |
| ORGANIK KIMYA HOLDING A.S., | ) | |
| ORGANIK KIMYA SAN. VE TIC. A.S., | ) | |
| ORGANIK KIMYA US, INC., | ) | |
| ORGANIK KIMYA LUXEMBURG | ) | |
| S.A., ORGANIK KIMYA | ) | |
| NETHERLANDS B.V. | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION**

Date Submitted:  July 21, 2017
Date Decided:  October 19, 2017

Rodger D. Smith II and Ryan D. Stottmann, of MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, Delaware; OF COUNSEL: Charles K. Verhoeven, Raymond N. Nimrod, and James E. Baker, of QUINN EMANUEL URQUHART & SULLIVAN, LLP, New York, New York, *Attorneys for Plaintiffs*.

Kathleen Furey McDonough, John A. Sensing, and Ryan C. Cicoski, of POTTER ANDERSON & CORROON LLP, Wilmington, Delaware; OF COUNSEL: J. Robert Robertson and Benjamin Holt, of HOGAN LOVELLS US LLP, Washington, DC, *Attorneys for Defendants*.

GLASSCOCK, Vice Chancellor

This action involves allegations by the Plaintiffs, well-known American chemical companies, that the Defendants were involved in a scheme to misappropriate trade secrets and proprietary polymer technology relating to paint pigments. The Complaint alleges that the Defendants used the purloined technology to create products that they sold in the United States. The Plaintiffs seek damages and injunctive relief.

With a single exception, the Defendants are foreign entities with no connection to this forum. The sole exception is a Defendant entity incorporated in Delaware. The other Defendants seek dismissal on the ground that this Court lacks personal jurisdiction over them. The Plaintiffs' contrary theory runs thus: The foreign Defendants caused the Delaware corporation to be chartered in this state as an integral part of their scheme and conspiracy to monetize the theft of the Plaintiffs' technology. Having taken advantage of the laws of this state to charter an entity in material furtherance of their illegal scheme, all Defendants are subject to jurisdiction under Delaware law, consonant with the due process protections of the United States Constitution, according to the Plaintiffs.

I find that the Defendants' Motion to Dismiss must be granted in part and denied in part. My reasoning follows.

1

# I. BACKGROUND

*A. The Parties and Relevant Non-Parties*

Plaintiff the Dow Chemical Company is a Delaware corporation with a principal place of business in Midland, Michigan.[1] Plaintiff Rohm and Haas Company is a Delaware corporation with a principal place of business in Philadelphia, Pennsylvania,[2] and Plaintiff Rohm and Haas Chemicals LLC is a Delaware limited liability company whose principal place of business is also Philadelphia, Pennsylvania.[3] In April 2009, the Dow Chemical Company acquired Rohm and Haas.[4] For ease of reference, I often call all of these entities "Dow."

Defendant Organik Kimya Holding A.S. is a privately held Turkish chemical company with a principal place of business in Istanbul, Turkey.[5] Defendant Organik Kimya San. ve Tic. A.S. ("Organik Kimya Turkey") is a wholly owned subsidiary of Organik Kimya Holding, and its principal place of business is likewise in Istanbul.[6] Defendant Organik Kimya Luxemburg S.A. is a wholly owned subsidiary of Organik Kimya Turkey; its principal place of business is in Luxemburg.[7] Defendant Organik Kimya Netherlands B.V. is a wholly owned subsidiary of

---

[1] Compl. ¶ 14.
[2] *Id.* ¶ 15.
[3] *Id.* ¶ 16.
[4] *Id.* ¶ 26.
[5] *Id.* ¶ 17.
[6] *Id.* ¶ 18.
[7] *Id.* ¶ 19.

Organik Kimya Luxemburg, and it is located in Rotterdam, Netherlands.[8] Defendant

Organik Kimya US, Inc. is a Delaware corporation whose principal place of business

is in Burlington, Massachusetts; it is a wholly owned subsidiary of Organik Kimya

Turkey.[9] I refer to all of the Organik Kimya entities except Organik Kimya US as

the "Foreign Defendants," and I often refer to the Organik Kimya entities

collectively as "Organik."

Simone Kaslowski is the CEO of Organik Kimya Turkey and Organik Kimya

Netherlands; he also serves on the board of Organik Kimya Holding.[10] Stefano

Kaslowski, Simone's brother, is the managing director of Organik Kimya Turkey.[11]

Like Simone, Stefano serves on Organik Kimya Holding's board.[12] The Kaslowski

brothers are the sole officers and directors of Organik Kimya US.[13] Neither is a

party to this case.

The Defendants assert, and the Plaintiffs do not dispute, that none of the

Organik entities have conducted any business in Delaware, maintained an office in

Delaware, had any employees in Delaware, or sold any products in Delaware.[14] As

discussed below, the Plaintiffs seek to establish personal jurisdiction over the

---

[8] *Id.* ¶ 20.
[9] *Id.* ¶ 21.
[10] Stottmann Aff. Ex. 1 at 13:7–25.
[11] Stottmann Aff. Ex. 6 at 11:12–15, 14:23.
[12] *Id.* at 11:5–8.
[13] Stottmann Aff. Ex. 33 at OKDEL00012335–37.
[14] Defs.' Supplemental Br. in Supp. of Mot. to Dismiss 2.

Foreign Defendants solely on the basis of a single act—the incorporation of Organik Kimya US in Delaware—on the theory that such incorporation was integral to Organik's scheme to misappropriate Dow's trade secrets.[15]

*B. Factual Overview*

This case stems from the Defendants' alleged misappropriation of the Plaintiffs' trade secrets for manufacturing various polymers useful in the production of paint pigments.[16] According to the Plaintiffs, the Defendants hatched and carried out a scheme in which they hired former Dow employees with knowledge of the relevant technology and used the trade secrets embodied in that technology to manufacture and sell polymers in competition with Dow.[17] I recite only those facts necessary to decide whether this Court has personal jurisdiction over the Foreign Defendants.

1. Organik's Initial Forays into the US Market

Organik Kimya Turkey started selling products in the United States in 1998.[18] At that time, Organik did not have a US subsidiary, and Organik Kimya Turkey sold its products in the US market primarily through third-party distributors.[19] While

---

[15] *See* Pls.' Supplemental Br. in Opp'n to Defs.' Mot. to Dismiss 4 ("Under seminal Delaware caselaw, Organik's formation of a Delaware subsidiary as part of its wrongful scheme and conspiracy is sufficient to confer personal jurisdiction over Organik related to Dow's claims arising out of that wrongful scheme.").
[16] Compl. ¶ 1.
[17] *Id.*
[18] Stottmann Aff. Ex. 10 at OKDEL00025096.
[19] *Id.*

Organik Kimya Turkey's US sales at this time were not significant, Organik began to consider expanding its United States presence in the mid-2000s.[20] For example, in 2006, Organik Kimya Turkey and Dow considered an arrangement in which Organik Kimya Turkey would toll manufacture[21] Dow's products in Europe and the Middle East and Dow would toll manufacture Organik Kimya Turkey's products in the United States.[22] The deal never came to fruition, however.[23] Also around this time, Organik reached out to Behr,[24] "one of the largest paint manufacturers in the U.S."[25] But, according to the Plaintiffs, Organik was not yet ready to sell to Behr or other major US customers.

The Plaintiffs contend that Organik faced two major hurdles in breaking into the US market. First, Organik's opaque polymers could not meet the standards of major US customers. For example, Behr did not want to buy OPAC 101 or OPAC 103, the opaque polymers Organik was selling in Europe.[26] And Simone Kaslowski, the CEO of Organik Kimya Turkey and Netherlands,[27] said it was his understanding

---

[20] Stottmann Aff. Ex. 1 at 167:18–168:25.
[21] According to the Defendants, "[t]oll manufacturing is contract manufacturing." Defs.' Supplemental Br. in Supp. of Mot. to Dismiss 6 n.2.
[22] Cicoski Aff. Ex. 3 at 43:18–46:17.
[23] *Id.* at 47:1–11.
[24] Stottmann Aff. Ex. 1 at 167:18–168:25.
[25] Pls.' Supplemental Br. in Opp'n to Defs.' Mot. to Dismiss 6.
[26] Stottmann Aff. Ex. 1 at 245:9–14.
[27] *Id.* at 13:7–25.

that Organik would not be able to penetrate the US market for opaque polymers until it improved its existing line of such products.[28]

The second obstacle to Organik's increasing its United States presence was that it lacked a US subsidiary. To support this assertion, the Plaintiffs point to Simone Kaslowski's testimony that in order to enter the US market in a significant way, it was important for Organik to have a US subsidiary that could understand US customers.[29] Simone further testified that creating a US subsidiary was necessary to do business with "multinationals," because multinationals wanted to buy directly from the producer rather than from a distributor.[30] The Plaintiffs also cite the deposition testimony of Stefano Kaslowski, Organik's managing director, who said that the "primary reason" for forming a US entity was to "allow[] the customers to have as a primary contact another U.S. company that was handling all the supply details, the Customs clearance, everything to do with formalities, . . . [thereby] enhanc[ing] the service level and the satisfaction of our customers."[31]

The Defendants dispute this account of Organik's attempts to expand its United States presence. They argue that the primary obstacle to Organik's penetrating the US market was that large US paint companies would not buy from

---

[28] *Id.* at 213:16–23.
[29] *Id.* at 65:13–19.
[30] *Id.* at 177:6–178:8.
[31] Stottmann Aff. Ex. 6 at 84:7–20.

Organik until it had a manufacturing facility in the country. They point to testimony from Bradley McPhee, an Organik Kimya US sales agent who, during his time at Organik Kimya US, proposed a four-pronged approach to achieving success in the US market: building a manufacturing plant in the United States, avoiding the architectural market, targeting markets in which Dow and BASF, a German chemical company, did not participate, and focusing on innovation.[32] More specifically, McPhee testified that in order "for [US customers] to do business with us, we needed to manufacture here in the US."[33] And according to Naim Benmayor, Organik Kimya US's sales manager, Organik did not need to create a US subsidiary in order to start manufacturing in the United States.[34]

### 2. Organik's Alleged Scheme to Misappropriate Dow's Trade Secrets

The Plaintiffs allege that in late 2007, Organik hatched a scheme to steal and use Dow's trade secrets by hiring Dow employees.[35] As part of this scheme, Organik reached out to Dr. Dilip Nene, a Dow employee, about working for Organik as a consultant.[36] During his time at Dow, Dr. Nene had been heavily involved in the production processes for ROPAQUE Ultra, an opaque polymer, and he had access

---

[32] Cicoski Aff. Ex. 2 at 70:12–73:16.

[33] *Id.* at 73:14–16.

[34] Cicoski Aff. Ex. 6 at 141:6–142:5. The Defendants also argue that when Simone Kaslowski referred to "multinationals" during his deposition, he was not talking about Behr. Defs.' Supplemental Br. in Supp. of Mot. to Dismiss 14 n.6.

[35] Compl. ¶ 39; Pls.' Supplemental Br. in Opp'n to Defs.' Mot. to Dismiss 10.

[36] Stottmann Aff. Ex. 7 at 99:23–101:13.

to the recipe for creating the "seed" employed in commercial production of ROPAQUE Ultra.[37] Dr. Nene began working as a consultant for Organik in February 2008.[38] The Plaintiffs allege that over the next four years, Dr. Nene illegally provided Organik with Dow's trade secrets related to the production of certain polymers.[39]

Organik also allegedly stole Dow's trade secrets by hiring Leonardo Strozzi, a former Dow employee who had been a manager at Rohm and Haas's emulsion polymer plant in Italy.[40] Organik interviewed Strozzi in December 2007, and according to the Plaintiffs, "[f]orensic inspection of an Organik company issued laptop shows that during the interview, Organik and Mr. Strozzi accessed and reviewed at least 19 Rohm and Haas emulsion polymer recipes that Mr. Strozzi had brought with him on portable storage devices."[41] In September 2008, Strozzi began working for Organik as the plant manager for its Rotterdam plant.[42]

The Plaintiffs focus on two products—ORGAWHITE 2000 and ORGAL P 850 RR ("850 RR")—that allegedly benefited from Dow's trade secrets. As discussed further below, the Plaintiffs allege that Behr's acceptance of these

---

[37] *Id.* at 21:9–32:9, 70:14–72:12; Pls.' Supplemental Br. in Opp'n to Defs.' Mot. to Dismiss 10–11.

[38] Stottmann Aff. Ex. 7 at 158:10–14.

[39] Compl. ¶¶ 3, 72–85.

[40] *Id.* ¶ 41.

[41] Pls.' Supplemental Br. in Opp'n to Defs.' Mot. to Dismiss 12 (citing Compl. Ex. B at 44–54).

[42] Compl. ¶ 41.

8

products led Organik to create its Delaware subsidiary in May 2010. As to 850 RR, the Plaintiffs claim that Organik was trying to sell that product to Behr in 2009, but that it did not meet Behr's specifications and so Behr requested that Organik make improvements.[43] Dr. Nene assisted in making these improvements, though he appears to have worked only on "scale-ups,"[44] which Organik argues do not involve substantive changes to the recipe.[45] Nevertheless, the Plaintiffs assert that Dr. Nene used his knowledge of Dow's trade secrets to help improve 850 RR. Notably, by May 2010, Behr had requested shipment from Organik of 850 RR samples from "[a]ctual production."[46]

According to the Plaintiffs, Organik created ORGAWHITE 2000, an opaque polymer, using trade secrets related to ROPAQUE Ultra, a Dow-produced opaque polymer whose performance was unmatched until ORGAWHITE 2000 appeared on the market.[47] As of 2008, "Dow was the exclusive opaque polymer supplier at Behr,"[48] but Behr had been interested in finding a substitute for ROPAQUE Ultra for some time.[49] Starting around 2006, Organik began working with Behr in an attempt to create just such a substitute.[50] But Organik was unable to produce a

---

[43] Stottmann Aff. Ex. 12 at ORG883ITC00112255.
[44] Stottmann Aff. Ex. 13.
[45] Defs.' Supplemental Br. in Supp. of Mot. to Dismiss 16 n.7.
[46] Stottmann Aff. Ex. 17 at OKDEL00033735.
[47] Compl. ¶¶ 27–38, 72; Stottmann Aff. Ex. 1 at 105:10–15.
[48] Pls.' Supplemental Br. in Opp'n to Defs.' Mot. to Dismiss 17.
[49] Stottmann Aff. Ex. 19 at ORG883ITC00014325.
[50] Stottmann Aff. Ex. 1 at 241:3–17.

ROPAQUE Ultra substitute that met Behr's standards.[51] The Plaintiffs allege that Organik achieved something of a breakthrough in this area when, in 2008 and 2009, Dr. Nene incorporated Dow's trade secrets into Organik's recipes for opaque polymers. The Plaintiffs cite an October 2, 2009 version of the ORGAWHITE 2000 recipe, which states that "[t]he whole method [for producing ORGAWHITE 2000] was discussed and revised with Dilip Nene."[52] Later, in February 2010, Behr tested the updated polymer and found that, while significant improvements had been made, the product was not yet up to Behr's standards.[53] The necessary improvements finally came in early 2010, when Dr. Nene allegedly shared more Dow trade secrets with Organik. In a March 17, 2010 email, an Organik scientist sent an email with the subject line "Good news about production of . . . Orgal Opac 204x."[54] The scientist said that "[t]he guy provided free monomer ratios for R&H production runs," as a result of which Organik "will produce [a] better product than [Dow's ROPAQUE] Ultra E."[55] The Plaintiffs argue that "the guy" is "a clear reference to

---

[51] Stottmann Aff. Ex. 19 at ORG883ITC00014325.
[52] Stottmann Aff. Ex. 28 at ORG883ITC00016448.
[53] Stottmann Aff. Ex. 19 at ORG883ITC00014325–26.
[54] Stottmann Aff. Ex. 21 at ORG883ITC00120481. OPAC 204X was an "[e]arly commercial iteration[] of ORGAWHITE 2000." Pls.' Supplemental Br. in Opp'n to Defs.' Mot. to Dismiss 2 n.2.
[55] Stottmann Aff. Ex. 21 at ORG883ITC00120481.

Dr. Nene."[56]  Perhaps as a result of these efforts, by May 2010, Behr had approved

ORGAWHITE 2000 as a replacement for Dow's ROPAQUE Ultra.[57]

### 3. Organik Incorporates a US Subsidiary in Delaware

According to the Plaintiffs, Organik decided to create a US subsidiary in May

2010 because it had recently secured Behr's approval for ORGAWHITE 2000 and

Behr had asked for shipment of 850 RR production samples.  To repeat, the Plaintiffs

allege that these two products benefited from trade secrets Organik stole from Dow.

The Plaintiffs here rely heavily on Simone Kaslowski's deposition testimony, in

which Simone said that one reason Organik incorporated Organik Kimya US in May

2010 was that Behr had both accepted shipment of 850 RR and approved

ORGAWHITE 2000.[58]  While Simone suggested that other reasons drove the

decision to create the Delaware subsidiary in May 2010, the Plaintiffs argue that he

was unable to articulate those other reasons.  They point to the following portion of

Simone's deposition testimony:

> Q: I said other than the reasons you've given regarding the potential
> sales to Behr [that is, Behr's approval of ORGAWHITE 2000 and 850
> RR], you can't think of any other reasons why you selected May of
> 2010 to incorporate the Organik US entity, right?
>
> A: Well, there are -- you know, there are many reasons why we -- you
> know, I explained this morning at length why we wanted to enter the
> United States, right?

---

[56] Pls.' Supplemental Br. in Opp'n to Defs.' Mot. to Dismiss 19.
[57] Stottmann Aff. Ex. 17 at OKDEL00033736.
[58] Stottmann Aff. Ex. 1 at 149:24–150:10.

Q: Yes. My question is: Why did you pick May of 2010?

A: There is no specific reason.

Q: No other reasons?

A: No.[59]

The Defendants argue that this testimony is "ambiguous," because it is "far from clear" that Simone "understood that the word 'other' meant 'other than the reasons you've previously given.'"[60]

Organik Kimya US was incorporated in May 2010, but Organik had been considering forming a US subsidiary since at least 2007.[61] In 2008 and 2009, as Organik's alleged scheme to misappropriate Dow's trade secrets progressed, Organik received legal advice about where, when, and how Organik Kimya US should be incorporated.[62] Organik continued to receive such advice in early- to mid-2010; as the Plaintiffs note, "[f]rom January 2010 to May 5, 2010 (the date of incorporation of Organik Kimya U.S.), Organik's privilege log reflects at least 80 entries relating to the formation of Organik Kimya U.S."[63] It appears that Organik

---

[59] *Id.* at 150:19–151:7.
[60] Defs.' Supplemental Br. in Supp. of Mot. to Dismiss 37.
[61] Stottmann Aff. Ex. 6 at 16:25–18:6, 87:5–19.
[62] Stottmann Aff. Exs. 29–30.
[63] Pls.' Supplemental Br. in Opp'n to Defs.' Mot. to Dismiss 25–26 (citing Stottmann Aff. Exs. 29–30).

chose to incorporate Organik Kimya US in Delaware (as opposed to a different state) for tax reasons and because of the ease of incorporating in Delaware.[64]

Organik Kimya US's sales of emulsion polymers appear to have been driven largely by ORGAWHITE 2000 and 850 RR. For instance, as the Plaintiffs point out, 79% "of the emulsion polymers sold by Organik Kimya US from 2010 through 2014 w[ere] ORGAWHITE 2000."[65] Indeed, Simone Kaslowski testified that ORGAWHITE 2000 was the only product offered by Organik Kimya US that achieved commercially significant sales.[66] The US International Trade Commission ("ITC") later barred Organik from importing opaque polymers such as ORGAWHITE 2000 into the United States for a period of twenty-five years.[67] In any event, Organik's sales in the United States appear to be a small percentage of sales from all Organik entities; the Defendants assert that from 2013 to 2014, "sales in the United States constituted only 3% of Organik's worldwide sales by volume."[68]

---

[64] Stottmann Aff. Ex. 2 at 31:2–32:9; Stottmann Aff. Ex. 3 at 109:15–25.

[65] Pls.' Supplemental Br. in Opp'n to Defs.' Mot. to Dismiss 28 (citing Stottmann Aff. Ex. 10).

[66] Stottmann Aff. Ex. 1 at 197:10–13.

[67] Compl. ¶ 9. The ITC entered this injunction after granting default judgment against Organik in a proceeding brought by Dow alleging, among other things, misappropriation of trade secrets related to Dow's opaque polymers. *Id.* ¶¶ 2, 4, 8. The default judgment was granted after the Administrative Law Judge concluded that Organik had "spoliated, or permitted the spoliation, of massive amounts of evidence." *Id.* ¶ 7. This ruling was later affirmed by the United States Court of Appeals for the Federal Circuit. *Organik Kimya, San. ve Tic. A.S. v. Int'l Trade Comm'n*, 848 F.3d 994 (Fed. Cir. 2017).

[68] Defs.' Supplemental Br. in Supp. of Mot. to Dismiss 14 (citing Cicoski Aff. Ex. 22 at OKDEL00002217).

And Organik Kimya US's sales made up less than 1% of Organik's global sales by volume.[69]

The Defendants contest the Plaintiffs' description of Organik's motivations for incorporating a Delaware subsidiary in May 2010. The Defendants point out that, because of "significant product testing hurdles,"[70] Behr did not enter a purchase agreement with Organik for ORGAWHITE 2000 until April 2012,[71] and Organik first sold ORGAWHITE 2000 to Behr in November 2012.[72] Moreover, while Behr had requested shipment of production samples of 850 RR by May 2010, raw material shortages prevented Organik Kimya US from selling 850 RR to Behr until 2016.[73] The Defendants also argue that the Plaintiffs have failed to offer any evidence suggesting that Behr itself would not do business with Organik until Organik formed a US subsidiary. And, according to the Defendants, Organik's relationship with Behr was initiated, managed, and facilitated by Brian Turk of Turk International, a California-based distributor.[74] Turk's role in the Behr relationship suggests to the

---

[69] Cicoski Aff. Ex. 1; Cicoski Aff. Ex. 22 at OKDEL00002217.
[70] Defs.' Supplemental Br. in Supp. of Mot. to Dismiss 16.
[71] Cicoski Aff. Ex. 29 at 72:17–20; Cicoski Aff. Ex. 30 at ORG883ITC00088776.
[72] Cicoski Aff. Ex. 29 at 82:9–13.
[73] Cicoski Aff. Ex. 1 at OKDEL00025103–04.
[74] Cicoski Aff. Ex. 2 at 60:21–25; Cicoski Aff. Ex. 3 at 170:6–16; Cicoski Aff. Ex. 7 at 92:25–93:8; Cicoski Aff. Ex. 24 at 59:9–25.

Defendants that incorporation of a Delaware subsidiary was not, in fact, necessary to enable Organik to sell to major US customers.[75]

## 4. The Various Organik Entities' Roles in the Alleged Scheme

The Plaintiffs assert that each Organik entity played a significant role in the alleged scheme to misappropriate Dow's trade secrets. Moreover, according to the Plaintiffs, "there is no practical distinction between the various Organik corporate entities."[76] This is demonstrated, the Plaintiffs say, by testimony from Organik Kimya US's sales agent to the effect that he did not distinguish between Organik Kimya US and other Organik entities.[77] The Plaintiffs also point out that the Defendants did not make such a distinction in their interrogatory responses.[78]

Turning to the various Organik entities themselves, Organik Kimya Turkey allegedly "hosted Dr. Nene and Strozzi for their interviews in late 2007, and began contacting customers in the United States just a few months later."[79] And Organik Kimya Turkey allegedly manufactured products made using Dow's trade secrets and sold them in the United States through Organik Kimya US.[80] Moreover, Organik

---

[75] The Plaintiffs emphasize that Simone Kaslowski said he, rather than Brian Turk, initiated the relationship with Behr. Stottmann Aff. Ex. 1 at 167:12–22.

[76] Pls.' Supplemental Br. in Opp'n to Defs.' Mot. to Dismiss 29.

[77] Stottmann Aff. Ex. 5 at 208:8–14.

[78] *See* Stottmann Aff. Ex. 31 at 11 (describing Simone Kaslowski as "a Co-Owner and General Manager of *Organik Kimya*" and stating that Stefano Kaslowski "is the Managing Director of *Organik Kimya*" (emphasis added)).

[79] Pls.' Supplemental Br. in Opp'n to Defs.' Mot. to Dismiss 30.

[80] *Id.*; Stottmann Aff. Ex. 31 at 12–13.

Kimya Turkey is Organik Kimya US's parent,[81] and Simone and Stefano Kaslowski—Organik Kimya Turkey's CEO and managing director, respectively—are Organik Kimya US's sole officers and directors.[82] Like Organik Kimya Turkey, Organik Kimya Netherlands also manufactured the purportedly unlawful polymers and sold them to the United States.[83] And Organik Kimya Netherlands hired Strozzi, the former Dow employee, to become plant manager for the Rotterdam plant.[84] As for Organik Kimya Luxemburg, that entity is Organik Kimya Netherlands' parent, and Organik Kimya Netherlands performed toll manufacturing for Organik Kimya Luxemburg.[85] Finally, Organik Kimya Holding allegedly "approves all strategic decisions for the Organik entities, as well as all budgets, and has the decision making power for the entire group of Organik entities."[86]

*C. This Litigation*

On March 8, 2016, the Plaintiffs filed their Complaint in this action. The Complaint contains four counts. Count I alleges misappropriation of trade secrets related to Dow's emulsion and opaque polymers.[87] Count II alleges conversion

---

[81] Stottmann Aff. Ex. 31 at 12.
[82] Stottmann Aff. Ex. 33 at OKDEL00012335–37.
[83] Stottmann Aff. Ex. 10; Stottmann Aff. Ex. 31 at 12.
[84] Compl. ¶ 41.
[85] Stottmann Decl. Ex. 10 at 3.
[86] Pls.' Supplemental Br. in Opp'n to Defs.' Mot. to Dismiss 31 (citing Stottmann Aff. Ex. 1 at 30:17–23, 33:9–13; Stottmann Aff. Ex. 2 at 177:14–178:13).
[87] Compl. ¶¶ 88–95.

resulting from Organik's theft and use of Dow's trade secrets.[88] Count III alleges unfair competition, Count IV alleges tortious interference with a prospective business opportunity, and Count V alleges tortious interference with contract.[89] Finally, Count VI alleges that the Defendants were unjustly enriched by their misappropriation of Dow's trade secrets.[90]

On April 8, 2016, the Defendants moved to dismiss the Complaint, arguing, among other things, that this Court lacks personal jurisdiction over the Foreign Defendants. The Plaintiffs opposed that motion, and in the alternative sought jurisdictional discovery. I heard oral argument on the Motion to Dismiss on June 7, 2016, at which time I ordered that jurisdictional discovery be conducted.[91] On June 1, 2017, the Plaintiffs filed a supplemental brief responding to the Defendants' jurisdictional arguments, and on June 30, 2017, the Defendants filed their own supplemental brief on the same issue. The parties then submitted further supplemental briefing on the US Supreme Court's recent decision in *Bristol-Myers Squibb Co. v. Superior Court of California, San Francisco County*.[92] I heard oral argument on these supplemental submissions on July 21, 2017.

---

[88] *Id.* ¶¶ 96–99.
[89] *Id.* ¶¶ 100–14.
[90] *Id.* ¶¶ 115–20.
[91] June 7, 2016 Oral Arg. Tr. 45:7–14.
[92] 137 S. Ct. 1773 (2017).

## II. ANALYSIS

When a defendant moves for dismissal under Court of Chancery Rule 12(b)(2), "the plaintiff bears the burden of showing a basis for the court's exercise of jurisdiction over the defendant."[93] Before any jurisdictional discovery has taken place, the plaintiff "need only make a *prima facie* showing, in the allegations of the complaint, of personal jurisdiction and the record is construed in the light most favorable to the plaintiff."[94] Where, as here, the parties have conducted jurisdictional discovery but the Court has not held an evidentiary hearing, the plaintiff's burden is heavier: she "must allege specific facts supporting [her] position."[95] Nevertheless, the plaintiff in such a situation still gets the benefit of all reasonable inferences drawn from the record.[96]

This Court engages in a two-step analysis to determine whether it has personal jurisdiction over a nonresident defendant.[97] First, the Court must evaluate "whether 'Delaware statutory law offers a means of exercising personal jurisdiction' over the

---

[93] *Ryan v. Gifford*, 935 A.2d 258, 265 (Del. Ch. 2007).
[94] *Spring Nextel Corp. v. iPCS, Inc.*, 2008 WL 2737409, at *5 (Del. Ch. July 14, 2008).
[95] *Medi-Tec of Egypt Corp. v. Bausch & Lomb Surgical*, 2004 WL 415251, at *2 (Del. Ch. Mar. 4, 2004) (quoting *Sears, Roebuck & Co. v. Sears plc*, 744 F. Supp. 1297, 1301 (D. Del. 1990)).
[96] *See Reid v. Siniscalchi*, 2014 WL 6589342, at *5, *13 (Del. Ch. Nov. 20, 2014) (noting that jurisdictional discovery had been taken and finding that "[a]t this stage in the proceedings, the Court is required to draw all reasonable inferences in [the plaintiff's] favor, even if other inferences appear more probable"); *Vichi v. Koninklijke Philips Elecs. N.V.*, 2009 WL 4345724, at *4 (Del. Ch. Dec. 1, 2009) (same).
[97] *Werner v. Miller Tech. Mgmt., L.P.*, 831 A.2d 318, 326 (Del. Ch. 2003).

nonresident defendant."[98]   Second, the Court "must determine whether exercising personal jurisdiction over the defendant passes muster under the Due Process Clause of the United States Constitution."[99]   The Court's exercise of personal jurisdiction over a nonresident defendant will satisfy due process "so long as there are 'minimum contacts' between the defendant and the forum."[100]

## A. Long-Arm Jurisdiction

The Plaintiffs argue that this Court has long-arm jurisdiction over the Foreign Defendants under 10 *Del. C.* § 3104(c)(1), which authorizes personal jurisdiction "over any nonresident . . . who in person or through an agent . . . [t]ransacts any business or performs any character of work or service in the State."   "Section 3104 is . . . a 'single act' statute that establishes jurisdiction over nonresidents on the basis of a single act or transaction engaged in by the nonresident within the state."[101]   Thus, Section 3104(c)(1) "will only support an exercise of personal jurisdiction with respect to those causes of action that have a nexus to the transaction of business that took place in the State."[102]

---

[98] *Ruggiero v. FuturaGene, plc.*, 948 A.2d 1124, 1132 (Del. Ch. 2008) (quoting *Amaysing Techs. Corp. v. Cyberair Commc'ns, Inc.*, 2005 WL 578972, at *3 (Del. Ch. Mar. 3, 2005)).

[99] *Terramar Retail Ctrs., LLC v. Marion #2-Seaport Trust U/A/D/ June 21, 2002*, 2017 WL 3575712, at *5 (Del. Ch. Aug. 18, 2017).

[100] *In re Silver Leaf, L.L.C.*, 2004 WL 1517127, at *3 (Del. Ch. June 29, 2004) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)).

[101] *Carlton Invs. v. TLC Beatrice Int'l Holdings, Inc.*, 1995 WL 694397, at *10 (Del. Ch. Nov. 21, 1995) (citing *Tabas v. Crosby*, 444 A.2d 250, 254 (Del. 1982); *Eudaily v. Harmon*, 420 A.2d 1175, 1180 (Del. 1980)).

[102] *Chandler v. Ciccoricco*, 2003 WL 21040185, at *11 (Del. Ch. May 5, 2003).

### 1. *Papendick* and Its Progeny

The Plaintiffs' theory is that the Defendants, or some of them, caused Organik Kimya US to be chartered in Delaware in material furtherance of their unlawful scheme to monetize their theft of the Plaintiffs' property. This, they assert, allows me to exercise jurisdiction over the Foreign Defendants under Section 3104(c)(1). The Plaintiffs rely heavily on *Papendick v. Bosch*[103] and its progeny in arguing this theory of jurisdiction over the Foreign Defendants. In *Papendick*, the plaintiff and the defendant, a German limited liability company, entered a contract in which the defendant agreed to pay the plaintiff a finder's fee if the defendant acquired the Borg-Warner corporation.[104] Eight days before the acquisition took place, the defendant had incorporated a Delaware corporation to "serv[e] as a vehicle for the acquisition of the [Borg-Warner] stock . . . involved [in the transaction]."[105] After the acquisition occurred, the defendant refused to pay the plaintiff the agreed-upon finder's fee, and the plaintiff brought suit in Delaware Superior Court.[106] While the Superior Court found that it lacked personal jurisdiction over the nonresident defendant, our Supreme Court disagreed.[107] The Supreme Court stressed that the defendant had formed a Delaware entity "as an integral component of its total

---

[103] 410 A.2d 148 (Del. 1979).
[104] *Id.* at 149.
[105] *Id.*
[106] *Id.* at 148–49.
[107] *Id.*

transaction . . . to which the plaintiff's instant cause of action relates."[108]  Through

that formation, the defendant "purposefully availed itself of the benefits and

protections of the laws of the State of Delaware for financial gain in activities related

to the cause of action," which was enough to "sustain the jurisdiction of Delaware's

courts over [the defendant]."[109]

Following *Papendick*, this Court has held that "a single act of incorporation,

*if done as part of a wrongful scheme*, will suffice to confer personal jurisdiction

under § 3104(c)(1)."[110]  But it is not enough to simply "participat[e] in the formation

of a Delaware entity."[111]  "Instead, the formation must be 'an integral component of

the total transaction to which plaintiff[']s cause of action relates.'"[112]  Put differently,

---

[108] *Id.* at 152.

[109] *Id.*  I note that, while "*Papendick* was decided in the context of determining Constitutional due process, Delaware courts have invoked the *Papendick* rationale to hold that the incorporation and operation of a Delaware subsidiary constitutes the transaction of business in Delaware under § 3104(c)(1)." *EBG Holdings LLC v. Vredezicht's Gravenhage 109 B.V.*, 2008 WL 4057745, at *6 (Del. Ch. Sept. 2, 2008).

[110] *Conn. General Life Ins. Co. v. Pinkas*, 2011 WL 5222796, at *2 (Del. Ch. Oct. 28, 2011).

[111] *Id.*

[112] *Id.* (quoting *Shamrock Holdings of Cal., Inc. v. Arenson*, 421 F. Supp. 2d 800, 804 (D. Del. 2006)); *see also Reid*, 2014 WL 6589342, at *10 ("When done as an integral part of a wrongful scheme, the formation of a Delaware entity confers personal jurisdiction under the long-arm statute."); *Newspan, Inc. v. Hearthstone Funding Corp.*, 1994 WL 198721, at *8 n.16 (Del. Ch. May 10, 1994) ("It is well-accepted that the incorporation of a company in Delaware in furtherance of a fraudulent scheme constitutes a contact with this jurisdiction sufficient to satisfy the requirements of the Due Process Clause, *particularly where the creation of the corporation is an integral part of the actions giving rise to suit*." (emphasis added)); Donald J. Wolfe, Jr. & Michael A. Pittenger, *Corporate and Commercial Practice in the Delaware Court of Chancery* § 3.04[c][3] (2016) ("[I]n suits in which the incorporation of a Delaware subsidiary is an integral component of the conduct giving rise to the cause of action, the Delaware courts have consistently recognized that a nonresident defendant's incorporation of such subsidiary constitutes constitutionally sufficient 'minimum contacts' with Delaware.").

21

the formation of a Delaware entity must be "central to the[ plaintiff's] claims of wrongdoing."[113]

The Plaintiffs' theory of personal jurisdiction goes as follows. Organik had been trying to make a splash in the US market for some time. Two obstacles stood in its way, however. First, Organik's polymers could not meet the exacting standards of large US customers such as Behr. Second, Organik lacked a US subsidiary, and without that, large US customers, again including Behr, would not be willing to buy Organik's products. Organik took care of the first problem by misappropriating Dow's trade secrets, which enabled it to manufacture polymers that met Behr's requirements. Organik dealt with the second obstacle by incorporating Organik Kimya US in Delaware. Having surmounted these two obstacles, Organik was able to sell in the US market large quantities of opaque polymers made using Dow's trade secrets. The incorporation of Organik Kimya US in Delaware was therefore an essential component of Organik's scheme to misappropriate Dow's trade secrets. Since that scheme forms the basis of the Plaintiffs' Complaint, the argument goes, this Court may exercise personal jurisdiction over the Foreign Defendants.

Based on the evidence presented, and giving the Plaintiffs the benefit of all reasonable inferences, I conclude that personal jurisdiction extends to Organik Kimya Turkey—Organik Kimya US's parent. For the reasons explained below, this

---

[113] *Cairns v. Gelmon*, 1998 WL 276226, at *3 (Del. Ch. May 21, 1998).

Court cannot exercise personal jurisdiction over the other Foreign Defendants. I begin, however, with the evidence that persuades me personal jurisdiction is proper over Organik Kimya Turkey.

First, the Plaintiffs have offered specific evidence supporting their allegation that, starting in late 2007, Organik began to carry out a scheme to misappropriate Dow's trade secrets. Around this time, Organik hired Dr. Nene, a former Dow employee with knowledge of trade secrets related to Dow's opaque polymers.[114] Organik also hired Strozzi, and there is evidence that during his interview with Organik, "Organik and Mr. Strozzi accessed and reviewed at least 19 Rohm and Haas emulsion polymer recipes that Mr. Strozzi had brought with him on portable storage devices."[115] Dr. Nene's role in improving the recipe for 850 RR is murky, but the Plaintiffs have put forth evidence suggesting that Dr. Nene used Dow's trade secrets to modify the recipe for ORGAWHITE 2000 in a way that seemingly satisfied Behr's requirements.[116] The evidence of record implies that Dr. Nene continued his work on ORGAWHITE 2000 until at least March 2010, only a few months before Organik Kimya US was incorporated.[117]

---

[114] Stottmann Aff. Ex. 7 at 21:9–32:9, 70:14–72:12, 158:10–14; Pls.' Supplemental Br. in Opp'n to Defs.' Mot. to Dismiss 10–11.

[115] Pls.' Supplemental Br. in Opp'n to Defs.' Mot. to Dismiss 12 (citing Compl. Ex. B at 44–54).

[116] Stottmann Aff. Ex. 28 at ORG883ITC00016448; Stottmann Aff. Ex. 21 at ORG883ITC00120481.

[117] Stottmann Aff. Ex. 21 at ORG883ITC00120481.

Second, the Plaintiffs have offered evidence suggesting that Organik decided to incorporate a US subsidiary in May 2010 in part because Behr had recently said it would be willing to accept some of Organik's opaque polymers. Organik had been contemplating creating a US subsidiary for several years.[118] While Simone Kaslowski's deposition testimony on this point is far from clear, what *is* clear is that, according to Simone, one reason Organik Kimya US was formed in May 2010, as opposed to some other time, was that Behr had recently signaled its approval of various opaque polymers produced by Organik.[119] Those polymers included ORGAWHITE 2000, and the Plaintiffs have offered evidence that Behr's approval of that product came only after Dr. Nene had incorporated Dow's trade secrets into its recipe.[120]

The Plaintiffs tie these two strands of evidence together via their allegation that Organik's decision to incorporate a US subsidiary was driven by its belief that such an entity was necessary to sell to large US customers, Behr included. According to the Plaintiffs, that belief proved well founded: After overcoming additional hurdles related to raw material shortages and product testing, Organik Kimya US eventually started selling the allegedly unlawful polymers to Behr.[121]

---

[118] Stottmann Aff. Ex. 6 at 16:25–18:6, 87:5–19.
[119] Stottmann Aff. Ex. 1 at 150:19–151:7.
[120] Stottmann Aff. Ex. 17 at OKDEL00033736.
[121] Cicoski Aff. Ex. 29 at 82:9–13; Cicoski Aff. Ex. 1 at OKDEL00025103–04.

Several pieces of record evidence support this story. First, Simone Kaslowski testified that he thought Organik would not be able to achieve a significant US presence until it formed a US subsidiary that could assist in understanding US customers.[122] He also said that multinationals would not do business with Organik until it formed a US subsidiary.[123] Stefano Kaslowski, for his part, asserted that a US subsidiary would enable "customers to have as a primary contact another US company that was handling all the supply details, the Customs clearance, everything to do with formalities, . . . [thereby] enhanc[ing] the service level and the satisfaction of our customers."[124] I also note that 98% of ORGAWHITE 2000 sales in the United States were placed through Organik Kimya US, the Delaware entity.[125]

Drawing all reasonable inferences in favor of the Plaintiffs, as I must at this stage of the proceedings, I find that these facts plausibly suggest that the formation of Organik Kimya US was a key component of Organik's scheme to misappropriate Dow's trade secrets. True, there are lacunae in this narrative, and Organik points to several pieces of evidence that undercut it. The gap between May 2010, when Organik Kimya US was incorporated, and November 2012, when Organik Kimya US first sold ORGAWHITE 2000 to Behr,[126] weakens the purported causal

---

[122] Stottmann Aff. Ex. 1 at 65:13–19.
[123] *Id.* at 177:6–178:8.
[124] Stottmann Aff. Ex. 6 at 84:13–20.
[125] Stottmann Aff. Ex. 10; July 21, 2017 Oral Arg. Tr. 84:18–24.
[126] Cicoski Aff. Ex. 29 at 82:9–13.

connection between incorporation and Organik's ability to reach large US customers such as Behr. But it does not eliminate the connection. And, as the Plaintiffs point out, it appears that Behr had at least tentatively approved Organik's opaque polymers around the time of Organik Kimya US's incorporation. That Organik Kimya US later ran into impediments that delayed its sales to Behr does not establish that incorporation of a US subsidiary had no effect on Behr's decision to buy from Organik.

Organik may also be correct that Organik Kimya US's relationship with Behr was largely managed by Brian Turk of Turk International. But the Plaintiffs have presented evidence that, while Turk managed the relationship, it was Simone Kaslowski who initiated contact with Behr.[127] And even if Turk were solely responsible for maintaining Organik Kimya US's relationship with Behr, it does not necessarily follow that the formation of a US subsidiary was not critical to Organik's broader misappropriation scheme. Further, while Organik cites evidence suggesting that a lack of US manufacturing facilities was the real obstacle to Organik's success with large US customers,[128] that evidence runs up against testimony put forward by the Plaintiffs regarding the importance of having a US subsidiary. At this procedural stage, I need not weigh this conflicting evidence or determine whether the Plaintiffs

---

[127] Stottmann Aff. Ex. 1 at 167:12–22.
[128] Cicoski Aff. Ex. 2 at 73:14–16.

have proven that Organik Kimya US was integral to Organik's misappropriation scheme. Instead, my task is only to decide whether the Plaintiffs have satisfied their burden of "alleg[ing] specific facts supporting [their] position" that this Court may exercise long-arm jurisdiction over the Foreign Defendants.[129] This they have done, at least with respect to Organik Kimya Turkey.

As noted above, Organik Kimya Turkey is Organik Kimya US's parent.[130] That, of course, suffices to show that Organik Kimya Turkey "participated in the formation of" Organik Kimya US, a prerequisite for establishing personal jurisdiction over a nonresident defendant under *Papendick* and its progeny.[131] But the Plaintiffs have failed to offer any record evidence suggesting that the other Foreign Defendants played any role whatsoever in the decision to create Organik Kimya US. Organik Kimya Netherlands may have hired Strozzi to run its Rotterdam plant,[132] and it may have manufactured some of the allegedly unlawful polymers that ended up in the United States;[133] but these facts say nothing about whether Organik Kimya Netherlands had anything to do with the formation of Organik Kimya US. Organik Kimya Luxemburg, for its part, performed toll manufacturing for Organik

---

[129] *Medi-Tec of Egypt Corp*, 2004 WL 415251, at *2 (quoting *Sears, Roebuck & Co.*, 744 F. Supp. at 1301).
[130] Stottmann Aff. Ex. 31 at 12.
[131] *Vichi*, 2009 WL 4345724, at *5.
[132] Compl. ¶ 41.
[133] Stottmann Aff. Ex. 10; Stottmann Aff. Ex. 31 at 12.

Kimya Netherlands, its subsidiary.[134]  But again, that does not suggest that Organik

Kimya Luxemburg participated in the incorporation of Organik Kimya US.  As for

Organik Kimya Holding, the Plaintiffs point out that it "approves all strategic

decisions for the Organik entities, as well as all budgets, and has the decision making

power for the entire group of Organik entities."[135]  Yet the Plaintiffs provide no

evidence that Organik Kimya Holding exercised that decision making authority with

respect to the creation of Organik Kimya US—the sole Delaware contact alleged in

this case.  In short, there is simply no evidence that Organik Kimya Netherlands,

Organik Kimya Luxemburg, or Organik Kimya Holding "meaningful[ly]

participat[ed] in the formation of the Delaware entity."[136]

### B. The Conspiracy Theory of Jurisdiction

The Plaintiffs do not rely solely on *Papendick* and its progeny, however.  They

also argue that personal jurisdiction over the Foreign Defendants is proper under the

so-called conspiracy theory of jurisdiction.  That theory rests "on the legal principle

---

[134] Stottmann Decl. Ex. 10 at 3.

[135] Pls.' Supplemental Br. in Opp'n to Defs.' Mot. to Dismiss 31 (citing Stottmann Aff. Ex. 1 at 30:17–23, 33:9–13; Stottmann Aff. Ex. 2 at 177:14–178:13).

[136] *Terramar Retail Ctrs., LLC*, 2017 WL 3575712, at *10.  I am also not persuaded by Organik's argument that, because there is no "practical distinction" between the various Foreign Defendants, I may simply ignore the separate corporate existence of these entities.  Pls.' Supplemental Br. in Opp'n to Defs.' Mot. to Dismiss 29.  I am aware of no authority supporting such a position, and the Plaintiffs have not pointed to any.  Nor do I believe that personal jurisdiction is proper over Organik Kimya Netherlands, Organik Kimya Luxemburg, or Organik Kimya Holding simply because the Organik entities share common management.  Again, without specific evidence tying these nonresident entities to the formation of Organik Kimya US, *Papendick* and its progeny do not permit this Court to exercise long-arm jurisdiction over them.

28

that one conspirator's acts are attributable to the other conspirators."[137] "The 'conspiracy theory' is not an independent jurisdictional basis."[138] Instead, it is "a shorthand reference to an analytical framework where a defendant's conduct that either occurred or had a substantial effect in Delaware is attributed to a defendant who would not otherwise be amenable to jurisdiction in Delaware."[139] Moreover, this Court has repeatedly stated that "the conspiracy theory of jurisdiction is narrowly construed."[140]

Our Supreme Court has established the following test for evaluating jurisdiction premised on a conspiracy theory:

> [A] conspirator who is absent from the forum state is subject to the jurisdiction of the court, assuming he is properly served under state law, if the plaintiff can make a factual showing that: (1) a conspiracy to defraud existed; (2) the defendant was a member of that conspiracy; (3) a substantial act or substantial effect in furtherance of the conspiracy occurred in the forum state; (4) the defendant knew or had reason to know of the act in the forum state or that acts outside the forum state would have an effect in the forum state; and (5) the act in, or effect on, the forum state was a direct and foreseeable result of the conduct in furtherance of the conspiracy.[141]

---

[137] *Matthew v. Fläkt Woods Grp. SA*, 56 A.3d 1023, 1027 (Del. 2012).

[138] *Crescent/Mach I Partners, L.P. v. Turner*, 846 A.2d 963, 976 (Del. Ch. 2000).

[139] *Computer People, Inc. v. Best Int'l Grp., Inc.*, 1999 WL 288119, at *5 (Del. Ch. Apr. 27, 1999).

[140] *Benihana of Tokyo, Inc. v. Benihana, Inc.*, 2005 WL 583828, at *8 (Del. Ch. Feb. 4, 2005); *see also Sustainable Energy Generation Grp., LLC v. Photon Energy Projects B.V.*, 2014 WL 2433096, at *6 (Del. Ch. May 30, 2014) (noting "this Court's repeated admonitions that the conspiracy theory is a 'strict test that should be construed narrowly'").

[141] *Istituto Bancario Italiano SpA v. Hunter Eng'g Co.*, 449 A.2d 210, 225 (Del. 1982).

"Although *Istituto Bancario* literally speaks in terms of a 'conspiracy to defraud,' the principle is not limited to that particular tort."[142] The fourth and fifth elements of the *Istituto Bancario* test "require allegations 'from which one can infer that a foreign defendant knew or should have known that the conspiracy would have a Delaware nexus.'"[143] This Court has clarified that "the five elements of the *Istituto Bancario* test functionally encompass both prongs of the jurisdictional test. The first three *Istituto Bancario* elements address the statutory prong of the test. The fourth and fifth *Istituto Bancario* elements address the constitutional prong of the test."[144]

For reasons that should be clear by now, this Court may not exercise personal jurisdiction over Organik Kimya Netherlands, Organik Kimya Luxemburg, or Organik Kimya Holding under the conspiracy theory. Even if I assume that these entities were members of a conspiracy to misappropriate Dow's trade secrets, and that the incorporation of Organik Kimya US in Delaware advanced that conspiracy, there is no record evidence suggesting that these nonresident defendants "knew or should have known" about any Delaware nexus to the scheme.[145] In lieu of offering such evidence, the Plaintiffs simply assert that Simone Kaslowski's "knowledge of

---

[142] *Carsanaro v. Bloodhound Techs., Inc.*, 65 A.3d 618, 636 (Del. Ch. 2013) (citing *Hamilton P'rs v. Englard*, 11 A.3d 1180, 1197 (Del. Ch. 2010)).
[143] *Virtus Capital L.P. v. Eastman Chem. Co.*, 2015 WL 580553, at *15 (Del. Ch. Feb. 11, 2015) (quoting *Matthew*, 56 A.3d at 1024).
[144] *Id.* at *12.
[145] *Matthew*, 56 A.3d at 1024.

the Delaware incorporation is imputed to each of" the Foreign Defendants.[146] Notably, the Plaintiffs cite no authority for this proposition. Absent any indication that these nonresident entities knew or should have known about the Delaware incorporation, the Plaintiffs cannot satisfy the fourth and fifth elements of the *Istituto Bancario* test.

The Plaintiffs' attempt to premise jurisdiction over the Foreign Defendants on a conspiracy theory fails for an additional, independent reason. The Plaintiffs allege a conspiracy among various Organik entities and their wholly owned subsidiaries. But "a corporation generally cannot be deemed to have conspired with its wholly owned subsidiary."[147] There are exceptions to this general principle. For example, the rule may not apply when a parent and its subsidiary do not "share common economic interests."[148] Yet the Plaintiffs have not attempted to show that any such exception applies here, and indeed their jurisdictional argument hinges on the assumption that "the various Organik entities operated as 'one Organik.'"[149] That alone defeats the Plaintiffs' attempt to establish personal jurisdiction over the Foreign Defendants on the basis of a conspiracy.[150] Thus, this Court cannot exercise

---

[146] Pls.' Supplemental Br. in Opp'n to Defs.' Mot. to Dismiss 42.

[147] *In re Transamerica Airlines, Inc.*, 2006 WL 587846, at *6 (Del. Ch. Feb. 28, 2006).

[148] *Allied Capital Corp. v. GC-Sun Holdings, L.P.*, 910 A.2d 1020, 1042 (Del. Ch. 2006).

[149] Pls.' Supplemental Br. in Opp'n to Defs.' Mot. to Dismiss 30.

[150] *See Am. Capital Acquisition Partners, LLC v. LPL Holdings, Inc.*, 2014 WL 354496, at *12 (Del. Ch. Feb. 3, 2014) ("While the Plaintiffs aver that '[t]he defendants' injurious actions were performed for reasons outside the normal course of their businesses,' they do not support this general assertion with any particularized allegations; thus, the general rule that a corporation

personal jurisdiction over any of the Foreign Defendants except Organik Kimya Turkey.

## C. Due Process

Because I have held that this Court may exercise personal jurisdiction over Organik Kimya Turkey, I must now determine whether doing so violates due process. "To satisfy due process, the exercise of personal jurisdiction must comport with traditional notions of fair play and substantial justice."[151] The question is whether the nonresident defendant "engaged in sufficient 'minimum contacts' with Delaware to require it to defend itself in the courts of this State."[152] "In order to establish jurisdiction over a nonresident defendant, the nonresident defendant's contacts with the forum must rise to such a level that it should 'reasonably anticipate' being required to defend itself in Delaware's courts."[153] I need not dwell on the due process question, however. That is because *Papendick* itself held that the formation of a Delaware subsidiary as an integral component of a transaction from which a plaintiff's claim arises is sufficient to satisfy due process.[154] And this Court has found it unnecessary to engage in a detailed due process analysis when it has found

---

cannot conspire with its wholly-owned subsidiaries and officers must apply." (alteration in original) (footnote omitted)).

[151] *Vichi*, 2009 WL 4345724, at *10.

[152] *AeroGlobal Capital Mgmt., LLC v. Cirrus Indus., Inc.*, 871 A.2d 428, 440 (Del. 2005).

[153] *Id.* (quoting *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980)).

[154] 410 A.2d at 152.

that *Papendick* applies to a nonresident defendant's conduct.[155]  Looked at another way, having incorporated a Delaware entity to further its unlawful scheme, a defendant cannot plausibly maintain that an exercise of jurisdiction over it in this forum in regard to that scheme was unforeseeable.  Accordingly, because I have already concluded that *Papendick* and its progeny permit personal jurisdiction over Organik Kimya Turkey, I also find that such an exercise of jurisdiction would not offend due process.[156]

### D. Remaining Issues

In addition to arguing that this Court lacks personal jurisdiction over the Foreign Defendants, Organik asserts that the Complaint fails to state a claim for relief under Court of Chancery Rule 12(b)(6).  Specifically, Organik argues that the

---

[155] *See Microsoft Corp. v. Vadem, Ltd.*, 2012 WL 1564155, at *7 n.35 (Del. Ch. Apr. 27, 2012) ("Because the incorporation of a Delaware corporation as an integral component of a total transaction to which a plaintiff's cause of action relates is sufficient to satisfy § 3104 and constitutional due process, I need not discuss separately the second prong of the personal jurisdiction analysis.").

[156] The US Supreme Court's recent decision in *Bristol-Myers Squibb Co.* does not affect my analysis here.  In that case, the plaintiffs, most of whom were not California residents, sued Bristol-Myers Squibb Company ("BMS") in California state court, "asserting a variety of state-law claims based on injuries allegedly caused by a BMS drug called Plavix."  *Bristol-Myers Squibb Co.*, 137 S. Ct. at 1777.  While BMS sold Plavix in California, it "did not develop Plavix in California, did not create a marketing strategy for Plavix in California, and did not manufacture, label, package, or work on the regulatory approval of the product in California."  *Id.* at 1778.  Moreover, "[t]he nonresident plaintiffs did not allege that they obtained Plavix through California physicians or from any other California source; nor did they claim that they were injured by Plavix or were treated for their injuries in California."  *Id.*  The Supreme Court understandably held that personal jurisdiction was not proper over these nonresident plaintiffs: "What is needed—and what is missing here—is a connection between the forum and the specific claims at issue."  *Id.* at 1781.  But in the present case, there *is* a connection between Delaware and the claims alleged in the Complaint: Organik's decision to incorporate a US subsidiary in Delaware, which allegedly was a key component of its misappropriation scheme.

Delaware Uniform Trade Secrets Act ("DUTSA") displaces the Plaintiffs' common law claims, and that the DUTSA does not apply extraterritorially. In light of my decision on personal jurisdiction, I find it appropriate to defer ruling on these issues. The parties should confer on how they wish to proceed as to the Defendants' Rule 12(b)(6) arguments in consideration of the holding here.

### III. CONCLUSION

For the foregoing reasons, the Defendants' Motion to Dismiss for lack of personal jurisdiction is granted in part and denied in part. Consideration of the Defendants' Rule 12(b)(6) arguments for dismissal is deferred. The parties should submit an appropriate form of order.